IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IPC SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 16-443 (GMS) |
| | ) | |
| CLOUD9 TECHNOLOGIES LLC, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | **REDACTED - PUBLIC VERSION** |

## SECOND AMENDED COMPLAINT

Plaintiff IPC Systems, Inc. ("Plaintiff" OR "IPC"), by and through its attorneys, for its

Second Amended Complaint against Defendant Cloud9 Technologies LLC ("Defendant" or

"Cloud9"), hereby alleges as follows:

### NATURE OF ACTION

1.      This is an action for infringement of United States Patent Nos. 8,189,566 ("'566

Patent") and 6,212,177 ("'177 Patent") under the Patent Laws of the United States, 35 U.S.C. § 1

*et seq.*

2.      This is also an action under the Defend Trade Secrets Act of 2016 ("DTSA") and

the New Jersey Trade Secrets Act ("NJTSA") for trade secret misappropriation.

### PARTIES

3.      Plaintiff IPC is a Delaware corporation organized and existing under the laws of

the State of Delaware with a principal place of business at Harborside Financial Plaza 10, Jersey

City, New Jersey 07311.

4.      On information and belief, Defendant Cloud9 is a limited liability company

organized and existing under the laws of the State of Delaware with its principal place of

business at 565 5th Avenue, New York, New York 10017.

Original Filing Date: December 8, 2017
Redacted Filing Date: December 12, 2017

**JURISDICTION AND VENUE**

5. This is an action for patent infringement arising under the Patent Laws of the United States 35 U.S.C. § 1 *et seq*., as well as an action for misappropriation of trade secrets arising under 18 U.S.C. §§ 1831, *et seq*., and N.J.S. § 56:15, *et seq*.

6. This Court has subject matter jurisdiction over the action under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the Patent Laws of the United States. In addition, this Court has jurisdiction over this action under 28 U.S.C. § 1331 as IPC's DTSA claim arises under federal law, specifically, 18 U.S.C. § 1831, *et seq*.

7. This Court has supplemental subject matter jurisdiction over IPC's NJTSA claim under 28 U.S.C. § 1367 because this claim is so related to IPC's claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative fact.

8. On information and belief, this Court has personal jurisdiction over Cloud9 because Cloud9 is a Delaware company. It is registered with the Delaware Department of State Division of Corporations under file number 5472078 and maintains a registered agent for service of process in Delaware.

9. Venue in this District is proper pursuant to 28 U.S.C. §§ 1391(b) and (c), and 1400(b).

**BACKGROUND**

10. Founded in 1973, IPC is a leading provider of global communications solutions and software for the financial services community.

11. IPC's vast product line includes solutions such as the IQ/MAX Omni and the Maxaccess 1000 that are both embodiments of the '566 Patent.

12.     On May 29, 2013, the USPTO duly and legally issued the '566 Patent entitled "Software Based Trading Turret" to inventors Aseem Bakshi, Rajnish Jain, Andrew G. Klaiber, Kathleen N. Udall, and Ravi K. Vankayala.  A true and correct copy of the '566 Patent is attached as Exhibit 1.

13.     IPC, as assignee, owns the entire right, title, and interest in the '566 Patent, including the right to sue for infringement.

14.     On April 3, 2001, the USPTO duly and legally issued the '177 Patent entitled "Remotely Accessible Key Telephone System" to inventors Steven Greene and Richard C. Bozzuto, Jr.  A true and correct copy of the '177 Patent is attached as Exhibit 5.

15.     IPC, as assignee, owns the entire right, title, and interest in the '177 Patent, including the right to sue for infringement.

16.     On information and belief, in January of 2014, three former IPC executives ██████████████████████████████████████████████ founded Cloud9, a competing venture that provides voice and messaging services for the trading community.

17.     On information and belief, Cloud9 is headquartered in New York; however, it transacts business all over the world.

18.     IPC's IQ/MAX Omni and Maxaccess 1000 products provide mobile software turrets designed to make trading possible anywhere.

19.     Cloud9 launched its C9 Trader platform ("C9Trader") in 2014, which competes with and provides similar functionality to at least IPC's Maxaccess 1000 and IQ/Max Omni products.  On information and belief, the Cloud9 product provides real-time communication capabilities through application programming interfaces (APIs) and Amazon Cloud

Infrastructure. A true and correct copy of *WebRTC in the Financial Sector – An Interview with Leo Papadopoulos,* which describes the Cloud9 functionality, is attached as Exhibit 2.

20.     On information and belief, several former IPC employees joined Cloud9 since its formation, with the most recent move occurring in August of 2016.  These former IPC employees who now work for, or have worked for Cloud9 include, but are not limited to, ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

21.     On information and belief, at least one former IPC employee who currently works for, or has worked for, Cloud9 worked in IPC's headquarters in Jersey City, NJ.  By way of example, ████████ worked in IPC's headquarters in New Jersey.

22.     On information and belief, former IPC employees who joined Cloud9 are working in essentially the same roles as they did when employed by IPC.  By way of example, on information and belief, ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

23.     Former IPC employees who joined Cloud9 were privy to IPC's confidential information, including trade secrets.

24.     IPC's trade secrets, which are outlined in IPC's Employment Handbook under the section entitled "Trade Secret Policy," include, but are not limited to: IPC customer lists; descriptions of IPC's relationships with its customers, such as product or service purchases, pricing policies, price lists, discounts, orders and revenue; computer systems, software (object code and source code) and databases; as well as other information not generally and publicly known regarding IPC or its operations, products, suppliers, markets, sales, costs, profits or customers, or other information acquired, disclosed or made known to any employees or agents during the course of their employment or agency that, if used or disclosed, could adversely affect IPC's business or give its competitors a commercial or economic advantage. A true and correct copy of IPC's Trade Secrets Policy from the IPC Employee Handbook is attached as Exhibit 3.

25.     IPC trade secrets are located on servers in Fairfield, NJ, Murray Hill, NJ, and Newark, NJ.  IPC's data center is located in Newark, NJ.

26.     Each and every IPC employee was contractually obligated to keep trade secrets confidential during the individual's employment with IPC and at all times thereafter. IPC's offer letter, which is signed by all employees, states that:

> During the course of your employment, you may come into possession of confidential and proprietary information relating to the Company or to third parties to which the Company owes a duty to keep information confidential. This information may include, among other things, financial information, trade secrets, business plans and customer lists. In consideration and as a condition of your employment, you are required to keep such information confidential during your employment and at all times thereafter, and may use such information only within the scope of your duties to the Company upon separation of your employment, you are required to return to the Company all materials and information provided to you by the Company. You may be required to sign additional confidentiality agreements during the course of your employment.

27.     Furthermore, IPC's severance agreement, which is governed by the laws of the State of New Jersey, (1) reiterates an employee's obligation to return all IPC property, including trade secrets, to IPC and (2) reiterates an employee's obligation to not disclose any IPC Confidential Information (which includes trade secrets) to any/all third parties.

28.     On information and belief, in violation of the Trade Secret Policy, several departing IPC employees transferred confidential IPC documents, including IPC client contact information (by way of example, names, phone numbers, and/or email addresses) and client price quotes (by way of example, documents with detailed cost and pricing information tailored to individual client(s)), as well as IPC technical documents (by way of example, Architecture Strategy Document), to their personal email addresses and/or personal online cloud computing services before leaving IPC to join Cloud9. At least some of the documents were specifically marked as "Confidential and Proprietary."

29.     On information and belief, the former IPC employees who transferred confidential IPC information to private accounts while still employed by IPC include, by way of example, █████████████████████████████████████████. On information and belief, ███████████ transferred numerous confidential IPC documents, many of which contain IPC trade secrets, to his personal online cloud computing service account ("Drop Box") beginning in April of 2016 through June of 2016.

30.     On information and belief, the confidential IPC documents ████████████ transferred to his Drop Box account include, but are not limited to, individually tailored IPC client price quotations, hardware/device pricing information, IPC Purchase, License, & Maintenance Agreements, IPC Assignment Agreements, IPC technical documents (which include, but are not limited to, schematics) and IPC purchase orders. Several of these documents also contain confidential client contact information including contact name, telephone number, and email address.

31.     On information and belief, the earliest transfer of trade secrets occurred in 2011 and the most recent transfer occurred in June of 2016.

32.     On information and belief, Cloud9 has utilized, and continues to utilize, former IPC employees and their knowledge of IPC's trade secrets, including customer information, to target IPC customers.

33.     Since the inception of Cloud9 and the departure of IPC employees to Cloud9, IPC has lost business, and continues to lose business, from numerous customers to Cloud9.  By way of example, on information and belief, IPC has lost business from numerous customers to Cloud9 in Texas alone beginning in September of 2015 and continuing through May 31, 2016.

34.     ██████████ (former IPC employee who is currently employed by Cloud9) was the sales representative in charge of several of IPC's Texas clients whose business IPC has lost to Cloud9.

35.     On information and belief, ██████████ works in the same role at Cloud9 as he did at IPC – ████████████████████████████████████.

36.     On information and belief, former IPC employees who now work for Cloud9 have used and will continue to use IPC trade secrets, including IPC's customer information, to compete with IPC, because Cloud9 is a direct competitor of IPC and the former IPC employees who now work for Cloud9 are working in essentially the same roles as they did when employed by IPC.

37.     On information and belief, Cloud9 employs individuals who were intricately involved with the development and implementation of IPC technology, including but not limited to IPC's IQ/MAX Omni and Maxaccess 1000 products, and involved with the development of IPC's patent portfolio. By way of example, one of these individuals is ██████████ ██████████████████████.

38.     On information and belief, the C9Trader is selling rapidly and is currently used by more than 2,000 traders and is employed by over 350 different companies across 21 countries.

39.     On information and belief, Cloud9 has grown by a rate of 10 percent each month since January of 2015.

40.     On information and belief, Cloud9 is in possession of IPC trade secrets and uses IPC trade secrets to gain a competitive advantage over IPC not only across the United States, but across the world.

41.     Since the startup of Cloud9 and the departure of several IPC employees to Cloud9, IPC has suffered both actual damage and irreparable harm in the form of loss in market segment share and loss of customers among other forms of harm as a result of patent infringement and trade secret misappropriation.[1]

## COUNT ONE
## Infringement Of U.S. Patent No. 8,189,566

42.     IPC incorporates paragraphs 1 through 41 herein by reference.

43.     This cause of action arises under the patent laws of the United States and, in particular, under 35 U.S.C. § 1 *et seq.*

44.     IPC has owned, and has continued to own, the '566 Patent from the inception of Cloud9's infringing acts.

45.     In violation of 35 U.S.C. § 271, Cloud9 has infringed, and continues to infringe, both directly and indirectly, at least claims 1, 5, and 6 of the '566 Patent by, among other things, making, using, offering for sale, and selling unlicensed systems, products, and/or services that infringe at least claims 1, 5, and 6 of the '566 Patent. Such unlicensed systems, products, and/or services include, by way of example, Cloud9's C9Trader.

46.     Claim 1 of the '566 Patent recites:

A communications system, comprising:

a turret switching system constructed to communicate to a Web server, a turret device, and to a remote communications device via a first communications network, the Web server being constructed to communicate to a client device via a second communications network, and the client device constructed to control switching across a plurality of lines; and

---

[1] Discovery is just beginning in this case and is ongoing and further examples of misappropriation of IPC trade secrets will potentially be identified as the case progresses.

an interface having a button sheet corresponding to a plurality of line selectors and constructed to seize a corresponding line by causing the client device to communicate a predetermined message to the turret switching system over the second communications network.

47.     Claim 5 of the '566 Patent recites:

The communications system according to claim 1, wherein switching of the corresponding line is performed in the turret switching system.

48.     Claim 6 of the '566 Patent recites:

The communications system according to claim 1, wherein the first communications network and the second communications network are IP networks.

49.     Cloud9 has indicated that its servers are hosted by Amazon.com.  *See* Exhibit 2.

50.     In a video from a panel discussion put on by Cloud9 called Financial Technology and the Cloud, Leo Papadopoulos, Cloud9's Chief Technology Officer, indicated that Cloud9 deploys Web servers at various data centers.

51.     On information and belief, the turret device limitation of claim 1 is met at least by the C9Trader's ability to interface with existing turrets and to provide turret device functionality as claimed in the '566 patent.  A true and correct copy of *Cloud9 Introduces Gateway Service to Help Firms Connect with More Counterparties and Migrate Away from Turrets* is attached as Exhibit 4.

52.     On information and belief, the C9Trader provides a turret switching system by allowing its clients (a relatively small number of users) to access a large number of external lines.  *See* CLOUD9 TECHNOLOGIES, http://www.c9tec.com/c9-trader (last visited June 9, 2016) ("[C9Trader] is an easy to use software application for your PC or tablet that lets you talk and message with your trading counterparties…. Make as many connections as you want").

53.     On information and belief, the turret switching system communicates with a Web server deployed at various data centers via a first communications network.

54.     On information and belief, the first communication network can be the internet or an IP network.  *See* CLOUD9 TECHNOLOGIES, http://www.c9tec.com/about-us (last visited June 9, 2016) ("The ubiquity and power of the internet and IP networks as the most reliable and resilient transport layer").

55.     On information and belief, the Web server that Cloud9 deployed at various data centers also communicates over a second communications network to Cloud9 clients.

56.     On information and belief, the second communication network can be the internet or an IP network.  *See* CLOUD9 TECHNOLOGIES, http://www.c9tec.com/about-us (last visited June 9, 2016) ("The ubiquity and power of the internet and IP networks as the most reliable and resilient transport layer").

57.     On information and belief, the C9Trader interfaces with a switching system that allows access to a number of external telephone lines. Each of the boxes shown in the image below can represent a potential connection to an external telephone line or group of lines.  *See* CLOUD9 TECHNOLOGIES, http://www.c9tec.com/c9-trader (last visited June 9, 2016).



58.    A group button can be created using the following screen:



Activating a group button can, among other things, cause the lines in the group to be seized.  *See* Cloud9 Technologies, http://c9tec.com/knowledgebase/do-you-support-group-buttons (last visited June 9, 2016).

59.    Cloud9 therefore directly infringes at least claims 1, 5, and 6 of the '566 Patent.

60.    Furthermore, on information and belief, Cloud9 indirectly infringes the '566 Patent by having induced and continuing to actively induce at least C9Trader end users' to directly infringe at least claims 1, 5, and 6 of the '566 Patent.

61.    On information and belief, Cloud9 has induced and continues to actively induce infringement of at least claims 1, 5, and 6 of the '566 Patent despite having knowledge of the '566 Patent.  Cloud9's knowledge of the '566 Patent is based on, *inter alia*, former IPC employees who have worked for Cloud9 since its inception, and continue to work for Cloud9, who worked with IPC technology and were involved in IPC patent programs.

62.    On information and belief the former IPC employees who now work for Cloud9 had knowledge of the '566 Patent and the technologies it covered and therefore the former IPC

employees as well as Cloud9 knew or should have known that the C9Trader product infringed and continues to infringe the '566 Patent. By way of example, one these former IPC employees is ███████████████████████████████████████████████████████ ████████████████.

63. The '566 Patent was prosecuted and issued while ██████████████ was still employed by IPC as its ██████████████████████ and therefore ██████████████ knew or should have known of its existence and all the matter claimed by the patent.

64. On information and belief, despite Cloud9's knowledge of the '566 Patent, Cloud9 has continued to engage in activities to encourage and assist its end users or customers who use the C9Trader to directly infringe at least claims 1, 5, and 6 of the '566 Patent. For example, on Cloud9's website at www.c9tec.com, Cloud9 provides an instructional video to teach its customers how to download and use the C9Trader. *See* Introduction to Cloud9 Trader, http://c9tec-1843149.hs-sites.com/cloud9blog/introduction-to-cloud9-trader (last visited June 15, 2016). The video covers topics such as "Getting Started," "Connecting to Counterparties," and "Using Your C9 Trader." *Id.* Furthermore, Cloud9's website also has a detailed Help section where it further discusses how to download and use the C9Trader. *See* Cloud9 Support Center, Knowledge Base, http://www.c9tec.com/c9-support (last visited June 15, 2016).

65. On information and belief, the C9Trader customer or end user directly infringes the '566 Patent by using the C9Trader's system functionality as described in paragraphs 45-59.

66. On information and belief, Cloud9's specific intent to induce infringement is evident from the fact that Cloud9 knew or should have known its activities in encouraging and assisting customers in the use of the C9Trader, including but not limited to the activities set forth in paragraph 64, would induce its customers' direct infringement of the '566 Patent.

67.     On information and belief, Cloud9's specific intent to induce infringement is further evidenced by the fact that it created, and advertises, a program (Cloud9's Gateway Service – Exhibit 4) that when used in conjunction with the C9Trader allows the C9Trader to interface with turret devices and provide turret device functionality as claimed in the '566 Patent.

68.     On information and belief, Cloud9 has contributorily infringed the '566 Patent.

69.     On information and belief the C9Trader has no substantial non-infringing uses. For example, on information and belief, there is no substantial non-infringing use when using the C9Trader with Cloud9's Gateway Service because there is no other use than to implement the claimed invention in the '566 Patent - interfacing with turret devices and providing turret device functionality.

70.     On information and belief, Cloud9's Gateway Service is a material part of the invention because it allows for the C9Trader to interface with existing turret devices.

71.     The making, using, offering for sale, or selling of Cloud9's C9Trader in violation of IPC's patent rights has caused, and will continue to cause, harm to IPC for which damages are inadequate.

## COUNT TWO
## Misappropriation of Trade Secrets Under DTSA

72.     IPC incorporates paragraphs 1 through 71 herein by reference.

73.     The DTSA forbids the misappropriation of trade secrets.

74.     IPC's trade secrets which are outlined in IPC's Employment Handbook under the section entitled "Trade Secret Policy," include, but are not limited to: IPC customer lists; descriptions of IPC's relationships with its customers, for example, product or service purchases, pricing policies, price lists, discounts, orders and revenue; computer systems, software (object code and source code) and databases; and other information not generally and publicly known

regarding IPC or its operations, products, suppliers, markets, sales, costs, profits or customers, or other information acquired, disclosed or made known to any employees or agents during the course of their employment or agency that, if used or disclosed, could adversely affect IPC's business or give its competitors a commercial or economic advantage. A true and correct copy of IPC's Trade Secrets Policy from the IPC Employee Handbook is attached as Exhibit 3.

75.     IPC trade secrets were developed over time after the expenditure of significant effort and resources.

76.     IPC's trade secrets are not publicly available, and are kept within the knowledge and know-how of IPC's employees under strict confidentiality obligations and only shared with other parties bound by contractual obligations of secrecy.

77.     IPC communicates the importance of maintaining confidentiality, especially confidentiality of its trade secrets, to its employees in the employment offer letter, employment agreement, and in a general release agreement at the end of the employee's tenure at IPC.

78.     IPC's trade secrets can be of significant value to its competitors and can allow them to quickly and easily gain a competitive advantage over IPC.

79.     IPC takes reasonable measures to protect its trade secrets.  These measures include, but are not limited to, confidentiality agreements, non-disclosure agreements, and password and logic protected databases.

80.     Furthermore, employee access to IPC trade secrets is limited based on the employee's position and business need.

81.     On information and belief, several former IPC employees who now work for Cloud9 transferred confidential IPC information, including at least trade secrets such as client

contact information, client price quotes, and IPC technical information, to their personal email accounts and/or personal online cloud computing services before leaving IPC.

82.     On information and belief, at least one former IPC employee who now works for Cloud9 transferred confidential client contact information from his IPC email account to two personal email accounts after being notified of his termination from IPC.

83.     IPC's trade secrets relate to its products that are placed in interstate and foreign commerce due to the fact IPC's products are sold around the world.

84.     On information and belief, Cloud9 has used, and continues to use, the improperly obtained information to target IPC customers.

85.     On information and belief, Cloud9 has received new IPC trade secrets after May 11, 2016 through ███████████ who resigned from IPC in August of 2016 and is currently employed by Cloud9.

86.     On information and belief, ███████████ transferred numerous confidential IPC documents, many of which contain IPC trade secrets, to his Drop Box account beginning in April of 2016 through June of 2016.

87.     On information and belief, the confidential IPC documents ███████████ transferred to his Drop Box account include, but are not limited to, individually tailored IPC client price quotations, hardware/device pricing information, IPC Purchase, License, & Maintenance Agreements, IPC Assignment Agreements, IPC technical documents (which include, but are not limited to, schematics) and IPC purchase orders. Several of these documents also contain confidential client contact information including contact name, telephone number, and email address.

88.     On information and belief, technical features found in the C9Trader Community Directory originated at IPC and were misappropriated by Cloud9.

89.     On information and belief, IPC has lost, and continues to lose, business from several customers to Cloud9 as a result of the misappropriation.

90.     On information and belief, despite IPC's reasonable efforts to protect its trade secrets, Cloud9 misappropriated, and continues to misappropriate, IPC trade secrets by utilizing at least IPC's customer information to gain a competitive advantage over IPC.

91.     On information and belief, Cloud9 used, and continues to use, IPC's trade secrets without express or implied consent from IPC.

92.     On information and belief, Cloud9 knew, had reason to know, and currently knows that the trade secrets were acquired under circumstances that gave rise to a duty to maintain secrecy.

93.     On information and belief, Cloud9's current Chairman and Chief Executive Officer, President, Chief Operating Officer, Chief Technology Officer, Chief Financial Officer, Global Head of Sales and Managing Director, and Vice President of Professional Services are all former IPC employees and had a contractual obligation not to disclose IPC's trade secrets.

94.     As a result of Cloud9's misappropriation of IPC trade secrets, IPC has suffered, and continues to suffer, both actual damages and irreparable harm in the form of loss in market segment share and loss of customers among other forms of harm.

95.     IPC is entitled to actual damages from Cloud9 and for attorneys' fees.

96.     IPC's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

97.     Cloud9's actions will continue to cause irreparable harm and damages to IPC and its trade secret information if not restrained.

**COUNT THREE**
**Misappropriation of Trade Secrets Under NJTSA**

98.     IPC incorporates paragraphs 1 through 97 herein by reference.

99.     The NJTSA forbids the misappropriation of trade secrets.

100.    IPC's trade secrets which are outlined in IPC's Employment Handbook under the section entitled "Trade Secret Policy," include, but are not limited to: IPC customer lists; descriptions of IPC's relationships with its customers, such as product or service purchases, pricing policies, price lists, discounts, orders and revenue; computer systems, software (object code and source code) and databases; and other information not generally and publicly known regarding IPC or its operations, products, suppliers, markets, sales, costs, profits or customers, or other information acquired, disclosed or made known to any employees or agents during the course of their employment or agency that, if used or disclosed, could adversely affect IPC's business or give its competitors a commercial or economic advantage.  A true and correct copy of IPC's Trade Secrets Policy from the IPC Employee Handbook is attached as Exhibit 3.

101.    IPC trade secrets were developed over time after the expenditure of significant effort and resources.

102.    IPC's trade secrets are not publicly available, and are kept within the knowledge and know-how of IPC's employees under strict confidentiality obligations and only shared with other parties bound by contractual obligations of secrecy.

103.    IPC communicates the importance of maintaining confidentiality, especially confidentiality of its trade secrets, to its employees in the employment offer letter, employment agreement, and in a general release agreement at the end of the employee's tenure at IPC.

104.    IPC's trade secrets can be of significant value to its competitors and can allow them to quickly and easily gain a competitive advantage over IPC.

105.    IPC takes reasonable measures to protect its trade secrets.  These measures include, but are not limited to, confidentiality agreements, non-disclosure agreements, and password and logic protected databases.

106.    Furthermore, employee access to IPC trade secrets is limited based on the employee's position and business need.

107.    On information and belief, several former IPC employees who now work for Cloud9 transferred confidential IPC information, including trade secrets including at least trade secrets such as client contact information, client price quotes, and IPC technical information, to their personal email accounts and/or personal online cloud computing services before leaving IPC.

108.    On information and belief, at least one former IPC employee who now works for Cloud9 transferred confidential client contact information from his IPC email account to two personal email accounts after being notified of his termination from IPC.

109.    On information and belief, Cloud9 has used, and continues to use, the improperly obtained information to target IPC customers.

110.    On information and belief, Cloud9 has received new IPC trade secrets after May 11, 2016 through ████████████ who resigned from IPC in August of 2016 and is currently employed by Cloud9.

111.    On information and belief, ████████████ transferred numerous confidential IPC documents, many of which contain IPC trade secrets, to his Drop Box account beginning in April of 2016 through June of 2016.

112.     On information and belief, the confidential IPC documents ███████████ transferred to his Drop Box account include, but are not limited to, individually tailored IPC client price quotations, hardware/device pricing information, IPC Purchase, License, & Maintenance Agreements, IPC Assignment Agreements, IPC technical documents (which include, but are not limited to, schematics) and IPC purchase orders. Several of these documents also contain confidential client contact information including contact name, telephone number, and email address.

113.     On information and belief, technical features found in the C9Trader Community Directory originated at IPC and were misappropriated by Cloud9.

114.     On information and belief, IPC has lost, and continues to lose, business from several customers to Cloud9 as a result of the misappropriation.

115.     On information and belief, despite IPC's reasonable efforts to protect its trade secrets, Cloud9 misappropriated, and continues to misappropriate, IPC trade secrets by utilizing confidential information provided by former IPC employees to gain a competitive advantage over IPC.

116.     On information and belief, Cloud9 used, and continues to use, IPC's trade secrets without express or implied consent from IPC.

117.     On information and belief, Cloud9 knew, had reason to know, and currently knows that the trade secrets were acquired under circumstances that gave rise to a duty to maintain secrecy.

118.     On information and belief, Cloud9's current Chairman and Chief Executive Officer, President, Chief Operating Officer, Chief Technology Officer, Chief Financial Officer,

Global Head of Sales and Managing Director, and Vice President of Professional Services are all former IPC employees and had a contractual obligation not to disclose IPC's trade secrets.

119.   As a result of Cloud9's misappropriation of IPC trade secrets, IPC has suffered, and continues to suffer, both actual damages and irreparable harm in the form of loss in market segment share and loss of customers among other forms of harm.

120.   IPC is entitled to actual damages from Cloud9 and for attorneys' fees.

121.   IPC's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

122.   Cloud9's actions will continue to cause irreparable harm and damages to IPC and its trade secret information if not restrained.

## COUNT FOUR
## Infringement Of U.S. Patent No. 6,212,177

123.   IPC incorporates paragraphs 1 through 122 herein by reference.

124.   This cause of action arises under the patent laws of the United States and, in particular, under 35 U.S.C. § 1 *et seq*.

125.   IPC has owned, and has continued to own, the '177 Patent from the inception of Cloud9's infringing acts.

126.   In violation of 35 U.S.C. § 271, Cloud9 has infringed, and continues to infringe, both directly and indirectly, at least claims 8, 9, 10 and 11 of the '177 Patent by, among other things, making, using, offering for sale, and selling unlicensed systems, products, and/or services that infringe at least claims 8, 9, 10 and 11 of the '177 Patent. Such unlicensed systems, products, and/or services include, by way of example, Cloud9's C9Trader.

127.   Claim 8 of the '177 Patent recites:

A method of establishing remote access to a private line office network including a plurality of key telephone stations with line status information being displayed at said telephone stations, including the steps of:

a) establishing a data channel between said private line office network and a computer at a remote site via public network;

b) establishing a remote line status display at said remote site based on data received via said data channel;

c) selecting an accessible line from said remote line status display at said remote site;

d) communicating said selection from said remote site to said private line office network via said data channel;

e) establishing a voice channel independent of said data channel to said remote site via public network according to said selection from said remote site.

128.　Claim 9 of the '177 Patent recites:

A method of establishing remote access to an office network according to claim 8 wherein said data channel is established via Internet.

129.　Claim 10 of the '177 Patent recites:

A method of establishing remote access to an office network according to claim 8 wherein said voice channel is established via the public telephone switching network.

130.　Claim 11 of the '177 Patent recites:

A method of establishing remote access to an office network according to claim 8 wherein said voice channel is established via the Internet.

131.　On information and belief, the method steps of claim 8 are met at least by C9Trader's ability to interface with existing turrets and other users, and provide remote access to a private line office network in the manner claimed.

132.　For example, on information and belief, "Cloud9's Gateway service provides system interoperability between existing trader voice circuits and the Cloud9 community" by allowing "Cloud9 users [to] seamlessly connect with trading firms not yet established on

Cloud9's service and maintain their functionality for both shout-downs and ring downs." *See* Exhibit 4 at 2. "The hosted gateway option allows Cloud9 users to access traditional trader voice circuits by connecting their circuits to Cloud9 at a hosted facility." *Id.*

133. The C9Trader establishes a data channel between a private line office network and a computer at a remote site via a public network, such as, for example, an Internet network. *See* Ex. 6, C9 Trader Service User Guide (June 2017), *available at* http://c9tec.com/wp-content/uploads/2017/06/Cloud9_UserGuide_June_2017.pdf (last accessed Nov. 15, 2017) ("C9Trader User Guide"). For example, the C9Trader User Guide directs users to "[c]lick the channel you wish to make active. The channel will turn green … and the broadcast will begin transmitting through your speakers." *Id.* at 22. An illustration of accessible data channels is provided in the C9Trader User Guide:



*Id.* at 23. The C9Trader is designed to operate using public Internet connectivity. *See* Ex. 6, C9Trader User Guide at 21.

134. The C9Trader User Guide states that "[t]he Click to Call button opens a separate window where users can conduct one-on-one calls, using dialing capabilities, to any desk phone or mobile phone." *Id.* at 4. The C9Trader allows users to manage connections by finding counterparties to connect to, and initiating and/or receiving calls to or from the counterparties

using C9Trader.  *See* Ex. 7, Cloud9 Quick Start Guide, *available at* https://www.c9tec.com/wp-content/uploads/2016/08/Cloud9_Trader_10_Steps_v41.pdf (last accessed Nov. 15, 2017) ("Quick Start Guide").

135.    The C9Trader establishes a remote line status display at a remote site based on data received via a data channel.  For example, the C9Trader User Guide states: "Each button displayed on your main screen represents a counterparty.  You can initiate a call to a counterparty via a shoutdown or a ringdown.  Each button provides the user with presence status about their counterparty and whether a current voice call is in progress."



C9 Button types and status indications

Ex. 6, C9Trader User Guide at 5; *see also id.* at 21.  The C9Trader allows users to select an accessible line from the remote line status display at the remote site.  *See id.* at 5, 17-18, 21.

136.    The C9Trader operates to communicate a selection from a remote site to a private line office network via a data channel.  For example:



.

137.     In addition, the C9Trader User Guide states that users can "[c]hoose what kind of connection will be established, shoutdown or ringdown, and what the button label will be for your firm as well as the counterparty's firm.  Click done to send the invite to the counterparty trading group."  Ex. 6, C9Trader User Guide at 14.  The C9Trader User Guide also states that "[w]hen you are speaking, your name will be displayed on the button so everyone else connected can see who is speaking."  *Id.* at 5.  The C9Trader is also designed to allow users to connect with (and communicate selections to) trading firms that are not yet established on Cloud9's service.  *See* Exhibit 4 at 2.

138.     The C9Trader establishes a voice channel independent of a data channel to a remote site via a public network according to a selection from a remote site.  ▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  C9Trader uses WebRTC, which "allow[s] voice & video connections."  *See* Exhibit 2.  The C9Trader also "use[s] a WebSocket server for signaling."  *Id.*  On information and belief, the C9Trader allows users to communicate

voice and data to other remote parties, where the voice and data are communicated on independent channels.  *See* Ex. 6, C9Trader User Guide at 4-6, 14-15, 17-19.

139.    The C9Trader is designed to operate using public Internet connectivity to communicate voice and/or data.  *See* Ex. 6, C9Trader User Guide at 21; Ex. 9, C9 Trader System requirements, *available at* https://cloud9technologies.desk.com/customer/en/portal/articles/2752710-c9-trader-system (last accessed Nov. 15, 2017).  C9Trader is designed to communicate with "any desk phone or mobile phone."  Ex. 6, C9Trader User Guide at 4.

140.    Cloud9 therefore directly infringes at least claims 8, 9, 10, and 11 of the '177 Patent when Cloud9 performs the claimed method on the C9Trader.

141.    Furthermore, on information and belief, Cloud9 indirectly infringes the '177 Patent by having induced and continuing to actively induce at least C9Trader end users to directly infringe at least claims 8, 9, 10, and 11 of the '177 Patent.

142.    On information and belief, Cloud9 has induced and continues to actively induce infringement of at least claims 8, 9, 10, and 11 of the '177 Patent despite having knowledge of the '177 Patent.  Cloud9 has had knowledge of the '177 Patent, *inter alia*, because former IPC employees who have worked for Cloud9 since its inception, and continue to work for Cloud9, are familiar with IPC technology and were involved in IPC patent programs.

143.    On information and belief, the former IPC employees who now work for Cloud9 have had knowledge of the '177 Patent and the technologies it covered and therefore the former IPC employees as well as Cloud9 knew or should have known that the C9Trader product infringed and continues to infringe the '177 Patent.  By way of example, one these former IPC employees is ███████████████████████████████████████████████ ████████████████.

144.    The '177 Patent was in force and owned by IPC while ████████████ was still employed by IPC as its ████████████████████ and therefore ████████████ knew or should have known of its existence and all the matter claimed by the patent.

145.    On information and belief, despite Cloud9's knowledge of the '177 Patent, Cloud9 has continued to engage in activities to encourage and assist its end users or customers who use the C9Trader to directly infringe at least claims 8, 9, 10, and 11 of the '177 Patent.  For example, on Cloud9's website at www.c9tec.com, Cloud9 provides an instructional video to teach its customers how to download and use the C9Trader.  *See* Introduction to Cloud9 Trader, http://c9tec.com/news/introduction-cloud9-trader/ (last visited Nov. 15, 2017).  Furthermore, Cloud9 publishes a user guide which directs its customers to launch and use C9Trader.  *See* Ex. 6, C9Trader User Guide; *see also* Ex. 7, Quick Start Guide.

146.    On information and belief, the C9Trader customer or end user directly infringes at least claims 8, 9, 10, and 11 of the '177 Patent by using the C9Trader's system functionality as described in paragraphs 131-39.

147.    On information and belief, Cloud9 specifically intended to induce infringement in that Cloud9 knew or was willfully blind to the fact that its activities in encouraging and assisting customers in the use of the C9Trader, including but not limited to the activities set forth in paragraph 145, would induce its customers' direct infringement of the '177 Patent.

148.    On information and belief, Cloud9's specific intent to induce infringement is further evidenced by the fact that it created, and advertises, a program (Cloud9's Gateway Service – Exhibit 4) that when used in conjunction with the C9Trader allows the C9Trader to interface with turret devices and other users, and provide the functionality as claimed in the '177 Patent.

149.     On information and belief, Cloud9 has contributorily infringed the '177 Patent.

150.     On information and belief, the C9Trader has no substantial non-infringing uses. For example, on information and belief, there is no substantial non-infringing use when using the C9Trader with Cloud9's Gateway Service because there is no other use than to implement the claimed invention in the '177 Patent.

151.     On information and belief, Cloud9's Gateway Service is a material part of the invention because it allows for the C9Trader to interface with existing turret devices and other users.

## PRAYER FOR RELIEF

152.   Wherefore, Plaintiff respectfully requests that this Court enter judgment against Defendant as follows:

A.       Declaring that Cloud9 has directly and indirectly infringed the '566 Patent;

B.       Declaring that Cloud9 has directly and indirectly infringed the '177 Patent;

C.       Awarding damages adequate to compensate Plaintiff for the patent infringement that has occurred, together with pre-judgment interest and costs;

D.       Granting a permanent injunction enjoining Defendant from further infringement of the '566 Patent;

E.       Awarding all other damages permitted by 35 U.S.C. § 284;

F.       Finding this to be an exceptional case and awarding to Plaintiff of its costs and reasonable attorneys' fees incurred in this action as provided by 35 U.S.C. § 285;

G. Declaring that Defendant has misappropriated Plaintiff's trade secrets under both the NJTSA and DTSA;

H. Ordering Defendants to destroy all materials incorporating Plaintiff's trade secrets;

I. Granting a permanent injunction enjoining Defendant from further misappropriation of Plaintiff's trade secrets;

J. Awarding damages adequate to compensate Plaintiff for both the actual loss and the unjust enrichment caused by Defendant's misappropriation of Plaintiff's trade secrets;

K. Awarding such other relief, including other monetary and equitable relief, as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury for all issues triable by jury.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Karen Jacobs*

_____

Karen Jacobs (#2881)
Stephen J. Kraftschik (#5623)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
kjacobs@mnat.com
skraftschik@mnat.com

OF COUNSEL:

Peter Shapiro
David G. Varghese
FITZPATRICK, CELLA, HARPER, AND SCINTO
1290 Avenue of the Americas
New York, NY 10104
(212) 218-2100

*Attorneys for Plaintiff IPC Systems, Inc.*

Jason Dorsky
FITZPATRICK, CELLA, HARPER, AND SCINTO
975 F Street, NW
Washington, DC 20004
(202) 721-5435

Edward J. DeFranco
Patrick D. Curran
QUINN EMANUEL
51 Madison Avenue, 22nd Floor,
New York, NY 10010
(212) 849-7000

Original Filing Date:  December 1, 2017
Redacted Filing Date: December 12, 2017